Good morning. May it please the Court, my name is Jared Gardner with Perkins Coie. On behalf of the appellant James Crombie, with me is Co-Counsel Lauren Stanyer. I'll attempt to reserve four minutes for rebuttal, understanding that that may not be the case. The District Court's judgment in this case, entering summary judgment in favor of the CFTC and awarding civil penalties, restitution, and a permanent injunction, should be vacated and remanded. The District Court relied on two legal errors. It applied the wrong standard of willfully under Section 13a.4, and I'll refer just for reference to the sections of the statute as codified. The District Court also exceeded its authority to award restitution. In addition, the Court overlooked existing disputes of genuine disputes of fact regarding Mr. Crombie's state of mind, and it entered a punitive permanent injunction without providing any reasoning in its order to support that injunction. So the first legal error the Court made was applying a civil standard of willfully under Section 13a.4, when that statutory section calls for a criminal standard. Well, I mean, the government argues for that, but it then essentially says in any way, even if we applied the criminal standard, we'd be in the same place. So does this matter a lot? I'm sorry. So does this really matter? Yes. I think it does matter, although we would argue that we'd reach the same place just on the opposite side regarding — regardless of the standard. But I think it's appropriate to allow the District Court to evaluate this case under the — That's summary judgment. Yes, that's correct. So why would we — what's the reason for having the District Court judge you in court instead of us? Well, one reason is that remand is independently appropriate. For the other reasons  That's a different point. But with regard to this question, why wouldn't — if you were right, why wouldn't we just go ahead and apply it? Yeah. Well, the Court certainly could do so. Or even say it doesn't matter and assume the criminal. That's correct. The Court — Then why don't we assume it for now? Okay. And under the criminal standard, there are genuine disputes with respect to Mr. Crombie's statements, the information he provided to the NFA regarding those statements, and also the information he provided with respect to the questions about the loans that he had with Mr. Lamar and with Porteous. And those — the relevant facts that show that there's a genuine dispute are that with respect to the FEMAT statements that Mr. Crombie relied on third-party auditor Eulish to verify the information that he provided. But the evidence seems to be that the discrepancy was so huge that there's no way he couldn't have known about it. The discrepancy in — with respect to the values of the accounts that we're referring to? Right. Yes, there is a large — And even the content of the accounts, that the accounts weren't even about futures, and they were closed before the period of these reports, some of them, and that they were $40 instead of several million dollars. I mean, so somebody who's running this company couldn't have thought it was correct, just basically. Yes, Your Honor. There certainly is a significant discrepancy, and there certainly is evidence that weighs against Mr. Crombie. On the other hand, however, there is Mr. Crombie's testimony that he was focused on the day-to-day returns. That's what the information — But if the operation were closed, there were no day-to-day returns. Well, I don't believe the FEMAT accounts were closed. And if it was $40 as opposed to $20 million, he might have known the difference. Yes, it is a significant difference. Not just significant. It's huge, enormous. Yes. Gargantuan. Yes, it is a gargantuan difference. Those accounts, however, are — the relevance of those accounts was with respect to the rates of return that had been included on the And Mr. Crombie did have — his trading platform had been used in areas and for companies that had achieved comparable rates of return, so that evidence also does suggest that, at the very least, he was making some money, that the numbers weren't entirely out of thin air. But on the question of the merits, those issues ultimately, at the end of the day, relate only to the civil penalties that are appropriate in this case, because those are a function of the violations at issue. Independent from that, we believe remand is appropriate to address the award of restitution and the injunction that the district court entered. The district court didn't provide any reason, as I mentioned, in its remedies order, and didn't explain what the basis of its restitution award was, but we can probably infer that it was based on investor losses, because it awarded the amount that the CFTC had requested, and that was based on the investor losses. There's no factual issue here about whether the restitution order did, in fact, represent investor losses. It seems that that's pretty much established in this record. Yes, I think that's correct. So if you go back on remand, what would you do vis-a-vis the restitution issue if it's investor losses, and there's no factual dispute that those are the investor losses, what would a remand accomplish? The remand would be to calculate restitution under the appropriate standard for restitution. Well, stop, though. You just said that the investor losses are not factually in dispute here. So if the law is in the Ninth Circuit that restitution is predicated upon investor losses, then what is to be accomplished on remand? Well, we would argue that the law in the Ninth Circuit is that restitution in this case is investor losses. What if we disagree with that? Would remand still be required? If you disagreed with that, remand would not be required for purposes of restitution. As to the question, I mean, rescission is an equitable remedy, right? Yes. And if you had rescission, you would essentially have restitution, right? You would undo the contract, you'd give everybody back their money, subtracting whatever they'd already gotten back. Yes. I think that— So that's essentially restitution. Well, in this particular context under the Commodities Exchange Act, the other circuits have held—we cite the Wilshire and the American Metals Exchange case that recognize explicitly that restitution under the CEA cannot be based on investor losses, that it exceeds the court's authority. You can call it whatever you want to call it, but if you call it rescission and you say, all right, we're undoing the contract, we're undoing whatever arrangement there was and we're giving the money back, what argument is there for why that's not a proper, equitable remedy, whatever the circuits might have said? The argument is that it would be improperly based on investor losses in this court in Commerce and Planning. But why? I want to know why it would be improper. Because it exceeds the authority that the court has under this statute to— to give equitable remedies. That's an equitable remedy, a very traditional one. What's wrong with it? It's inconsistent with this court's decision in Commerce Planning is one. And for two aspects of that decision that I'll identify to this court. The first is the defendant in that case challenged the award of restitution that he had been ordered to pay because he did not receive the entirety of the ordered amount of money. That part of that money had been received by the company that was involved in the scheme in that case. And— Well, that's a different problem. It's not equitable to make somebody return money they don't have. That's a different question. Well, the authority to award restitution under the — in civil proceedings brought under the FTC is the same as in the CEA. And now this court in Commerce Planning separately addressed the question of what is the appropriate measure of restitution for these statutes. And it adopted a two-part burden-shifting test where the first part puts it on the agency to show that the restitution award that's requested is — is related and approximates the unjust enrichment that the defendants received. So it ties restitution to unjust enrichment, and that's the nature of the remedy that's available. And it says you can't have a rescission? The statute doesn't say anything specifically, explicitly on that. It says equitable remedies. It doesn't — I'm not sure that it specifically says equitable remedies. But, yes, it's been interpreted to allow district courts to use its equitable authority. But under the statute in Commerce Planning, the court ties it to unjust enrichment, and that's the — that's the nature that the court ties the available restitution remedies to. And it specifically, in addition, explains that under — under that test, those damages that's improper to — to award as a matter of restitution. And so on that basis, the district court exhort — exceeded its authority in this case, and restitution should be measured as a function of unjust enrichment, which was not adequately presented to the district court. And that's what we think should be reviewed on remand on the question of restitution. Now, remand is independently appropriate as well. Let me ask you this. What is the unjust benefit that was received by the defendant? I think the record is — is not entirely clear, but he did receive — or his agreements with the investors in this case did offer him some sort of fee, the arrangement as he testified to in his deposition. Is there any realistic issue here that the loss suffered by the victim is not greater than any possible unjust benefit that the defendants may have received, which seems to be significantly less than the loss suffered by the victim? Is there any factual dispute about that? I don't believe so. I think any unjust enrichment that he would have received would be less than the loss suffered by the victim. Then why don't you just measure this by the loss? It seems that that's what the Ninth Circuit says we should do. In Commerce Planet you're referring to? Well, look at that FTC versus Figge International, Inc., if I pronounce that correctly. Yes. Well, ordinarily the proper measure of restitution is the amount of enrichment received if the loss suffered by the victim, and that's $750,000 here roughly, right, is greater than the unjust benefit received by the defendant, which I think whichever way you look at the facts is clearly the case here. The proper measure of restitution may be to restore the status quo. I think Figge is distinguishable on two bases. One, the statute at issue in Figge did, as the Court notes, explicitly identify damages as an available form of remedies. And in addition, Figge is of a line of cases like FTC versus Stefanczyk, which the CFTC relies on heavily in this case, that Commerce Planet clarifies that those cases are about where one defendant is held responsible for the unjust enrichment that exceeds his or her own, where that defendant is jointly and severally liable with others. We submit that that's the best reading of those cases, and that Commerce Planet in its discussion of how to measure restitution ties it directly to unjust gains. Well, it seems this is a clean-cut factual dynamic to me, unless I'm missing something here. Yes, Your Honor. I think that's largely true. I think there's not probably a factual dispute that the unjust gains Mr. Crombie received is, in fact, less than what Mr. Watson said. So we're going to remand. We want to remand for a real reason. We don't want to burden the district court with having to do something which is not relevant at all. Absolutely. I understand an alternative would be to just vacate the award of restitution as outside the Court's authority. But if there are no specific further questions, I'll save the remainder of my time for rebuttal. Thank you very much. Thank you. Thank you. May it please the Court. Martin White for the Commodity Futures Trading Commission. I think it's useful to put on the table one procedural point and three undisputed facts that provide the context for pretty much all the issues in this case. Procedurally, if you look at Mr. Crombie's principal brief in the argument, you will find that he does not dispute the district court's findings that he gave false information both to the National Futures Association, the self-regulatory organization, and to his customers when he was soliciting them. Well, he just used some of the details, as I understand it, with regard particularly to these loan investments with Lamar and the other person. Okay. On his representations concerning the loans, I think it's useful to look at two sorts of evidence in the record. If you look at his statements either in deposition or I think in some emails to persons other than the National Futures Association, and if you read the entire sentence or the entire paragraph and not limit yourself to snippets of words as in Mr. Crombie's brief, the basic message he consistently and clearly conveys is that Mr. Porteus and Mr. and Mrs. Lamar invested money into his business. Well, at one point he says he's paying them, they paid him for services. Yes, that is what he tells the National Futures Association. And to everyone other than the National Futures Association, he says they were investing, but some of the investment took the form of a loan. And he is perfectly clear about that. I believe he states that all of Mr. Porteus's investment took the form of a loan and a portion of the Lamar's investment, $50,000 out of $300,000, took the form of the loan. And that is what he consistently tells everyone except the National Futures Association. When he communicates with the National Futures Association, and I'm saying this both based on emails to the National Futures Association from Mr. Crombie on the record and based on affidavits and so forth by National Futures Association investigators, he is also quite clear in his statements except that he is silent on the subject of loans. In the case of Mr. Porteus, he talks about investment without mentioning that the investment took the form of a loan. In the case of the Lamar's, he talks about investment and he talks about a payment for services but again leaves out the point about loans. Given that Mr. Crombie was an experienced finance professional and given that the NFA had specifically asked him about loans and thus chewed up the subject that was, you know, in his mind, it seems to me clear that this is willful misrepresentation to NFA on that particular subject. What about the district court applied to the civil standard? Yes. What exactly is the difference, first of all? I think there are two differences, especially in the Ninth Circuit in use of the word willfully in civil context under the Commodity Exchange Act. This court has held that it includes careless disregard for truth or falsity of statements. And you're arguing that the criminal standard includes reckless disregard. So it's either careless disregard or reckless disregard, basically. Correct. So that's not a huge difference but there may be some cases where it would be easier for us to prove careless disregard than reckless disregard. But you don't disagree that we could go ahead and just, if we thought it was the criminal standard, we could say that and we could then go forward and apply it. In this case, absolutely. So one way to phrase that is you don't need to reach the issue. If it's the criminal standard, if it's the criminal standard, would the amount of proof be preponderance of evidence? In a civil case, yes. Because the only issue that the court raised here was the interpretation of the word willfully. We would still be in a situation where if it's the CFTC bringing the case under Section 13A, A without parentheses, dash 1, it would be a civil case governed by rules of civil procedure. In all respects, a civil case. And again, the only issue is how you interpret the word willfully. If it's a criminal case brought by the Justice Department, then you'd have proof beyond reasonable doubt. Has any court ever bought your argument that the civil provision which says enforce the criminal provision has a different standard than the criminal provision? As far as I know, at least under this particular statute, it has not come up. Okay. Now, I was looking in preparation for argument, I was doing some further research, so I'm going to mention something that's not in the brief, and you can stop me if you want. I note that in the Sherman Antitrust Act, I believe the basic provision in Section 1 says that certain actions in restraint of trade are felonies, and then the statute goes on to provide for civil enforcement. And I don't think there's an explicit scienter standard spelled out in that statute, but my understanding, and I'm not an antitrust expert, is that there are different standards of proof in criminal Sherman Act cases and civil Sherman Act cases. So that's a rather remote analogy. But again, unfortunately, under the particular statute at issue in this case, I have not located any precedent. So your adversary is talking about restitution. Maybe you can address that now. And, you know, I just want to sort out what the Ninth Circuit law is. I think I have to figure out what the Ninth Circuit law is. Yes, sir. And he has agreed, though factually, we know what the amount of investor losses are. There's no issue of fact there. That's conceded. How does that shake out in terms of Ninth Circuit law vis-à-vis restitution? Okay. Now, let me — I'm going to drop a footnote before I continue. The Commodity Exchange Act was modified in rather 2010 to clarify the law here, so we're talking pre-2010. At that point, our statute, like the relevant provision of the Federal Trade Commission Act, provided for injunctive enforcement, but there was a long line of authority, I think going back to some post-World War II Supreme Court case involving price controls, that says that injunctive authority carried with it broad equitable authority to correct the problem, and that broad equitable authority, because the court is enforcing a congressional policy embodied in statute, is even broader than the usual equitable authority of the court. And this is discussed in the Federal Trade Commission context. There was a very good discussion in Stefanchuk and then earlier cases at sites. I think the leading original case in the CFTC area is the Co-Petro case. Then you're trying to argue that there's no need to remand to consider the restitution order, and the reason for that is what? The reason for that is that in the Ninth Circuit, and the law is clearest in Federal Trade Commission cases, which is why I cited them, the measure of restitution for defrauded customers is actions that will make them whole, and that's, again, stated clearly, most clearly in the Stefanchuk case. Does that equate to investor losses? Yes. Your opponent cited to a case that he's claimed since the other one, and I've been trying to find the case. What case is he talking about? He's stated to a case called Commerce Planet, which is a 2016 case. It is cited in both our briefs. It's cited, but it's not cited for that. Yeah, I don't cite it for that. He doesn't either, as far as I can tell, but go ahead. Okay. I guess he attempts to argue that Commerce Planet abandons a standard of making the customer whole and switches to a standard of what counsel for Mr. Crombie calls unjust enrichment, and I think there are a couple of problems with that line of reasoning. First, Commerce Planet is not an en banc decision and both does not purport to and cannot overrule Stefanchuk and that whole line of authority. That's number one. And Stefanchuk, again, pretty squarely says you're trying to make the customers whole. It is true that in Stefanchuk you had two entities who worked together to defraud the customer, and there was a factual issue of allocating the remedy between those two partners, and that's true in Commerce Planet as well. But the reasoning of Stefanchuk does not rely on that fact. Instead, it relies on the bedrock principle that you're trying to make the customers whole. So that's point one. Stefanchuk is still good law. A second consideration is that in Commerce Planet, again, the focus of the court was on allocating the remedy between a couple of different perpetrators of the fraud, and I think that's why the court in that particular case got into these issues of joint and separate liability and so forth, which are not relevant in the present case. A third problem with Mr. Crombie's counsel's argument is his use of the term unjust enrichment in Commerce Planet to describe the holding of Commerce Planet. In Commerce Planet, the court did make some reference to the concept of gains to the perpetrator, but if you look at the actual standard it applies, it says it's not looking at net profits to the perpetrator, it's looking at net revenue. So if I may indulge a hypothetical, if I sell you a bottle of snake oil and I'm the fraudster, I sell you a bottle of snake oil for $10 and I spend $5 buying snakes to make the snake oil, the measure of restitution is still $10 under Commerce Planet, not $5. In other words, Commerce Planet was focusing on the flow of money from the defrauded victims into the fraudulent enterprise and not focusing on the actual enrichment that ended up in the pockets of the fraudster. Now, this case involves a somewhat different business model from the usual Federal Trade Commission cases. In Federal Trade Commission cases, the fraudster was selling something to customers and the money flow was in the form of purchases. Mr. Crombie's business model, rather than involving selling something, it involved assuming control of customer funds for purposes of trading futures. So the customers would—the exact legal mechanism isn't certain. The normal mechanism in this business would be a power of attorney, but the customers gave Mr. Crombie's company, Parron, power to trade their futures accounts. As described in the flipbook, the trades were actually executed by Parron's computers. And so there was some trading. A certain cut went to Parron as its profits. A certain amount of money was lost in the futures market through Crombie's flaky trading system, and the rest was returned to the customers. So the flow of money, the analog of the revenue in Commerce Planet, is the money that the customers placed under Crombie's control. The district court here didn't explain any of this. It didn't explain where it got its number from at all. Well, I think it is implicit that it was relying on the analysis and evidence provided by the government. Right, but it didn't explain—we just had a 10-minute conversation about why this is or isn't the right standard, and it didn't give any reason for why it concluded what it concluded. Yes. Is that itself a problem? I don't think so because it was clear that it was relying—well, for two reasons. One, it was clear that it was relying on what the government provided and what the government provided was adequate. And secondly, the general principle that you can uphold the district court decision on appeal if the record supports it to avoid unnecessary remands. And if you look at the facts presented by the government independently for purposes of summary judgment, they support the conclusion. Okay. Thank you very much. Der? Just—excuse me. A quick point with respect to the loans and the communications regarding the Lamars and Porsches. I would just urge the Court to look at ER 399 and 400. That's a communication that Mr. Crombie made to someone other than the NFA that I think shows that he, in the same breath, is treating those financial relationships as both or at least recognizes some confusion as to the nature of them, whether they're loans or investments. Is that the $50,000 loan you're talking about? Both transactions are on those pages. But did he say definitively at some points this was not a loan? Yes. He does say definitively at some points that it's not a loan. Definitively. Yes. But at the same —in the same communication, he also identifies the transactions as investments. And I think—yes? I'm sorry. Go ahead. You finish. Oh. I was just going to say that there is, in general, I think, some confusion as to the nature of these relationships. And we point to the Richard Brecht relationship that Mr. Crombie has as well. So here's what I want to ask. Let's assume there's some factual confusion about the $50,000 loan. What would be accomplished upon remand? What difference would it make? It would be relevant specifically to what the civil penalties are. Why? Because the —well, it's not clear. Again, the district court didn't provide any reasoning in its remedies order, so we don't know how the court got the number it came to for civil penalties. But they were —in the CFTC's request for penalties, it based them on what it identified as the violations of the statute. Well, the penalty was three-quarters of a billion dollars, right? Yes. Yes. So the $50,000 factor, you say, would reduce the penalty below that number? I'm sorry. Could you repeat the question? If we agree with you on the $50,000, it was not a loan. I just want to know what impact it would have. It would not affect restitution, I take it. Would it affect the penalty, and if so, how? Well, it would be up to the district court. We don't know how the district court got exactly the penalty that it came to, but it's a function in part on the number of violations. So if you agree with me on these issues, then there would be fewer violations. It seems to me like a very small part of the whole dynamic here that seems that it would not, as a practical matter, impact anything, either restitution or civil penalty. But if I'm wrong, I'd like to know why. I think you are wrong. I think it would impact the civil penalties. But part of the problem is we don't know exactly how because the district court did not lay out how it did that calculation. But we do know or can assume because of the briefing that the CFTC provided that it's based at least in part on the number of violations at issue, and this would affect the number of violations. I would like – I'm trying to – I've been staring at the briefs, and I can't find where this Commerce Platta case is cited. Am I missing something? Yes. Where is it? I've been going through and through and through, and I can't find it. I know it's definitely discussed and cited in our reply brief. We discuss it in response to the CFTC's reliance on Stefancheck, and I can get you the page number. I'd appreciate that. I'm looking at the table of authorities. It says FTC versus Stefancheck, FTC versus FIG International. That's it. Oh, I think it may be because it's cited as United States Commodities Future Trading Commission. Oh, no, I'm sorry. It's at FTC. I apologize. It's not here. I apologize. At least it's not in the table of authorities. Let's put it that way. All right. You can send a note in, or I'll find it if it's here. But I stared and stared and stared, and I can't find it. Thank you. Your time is up. I have the site. It's page 16. Okay. Thank you. Thank you both. The case of United States Commodity Futures Trading Commission versus Cromley is submitted. We'll go to the last case of the day, United States versus Mondragon and Moya, and I guess I would like to know how the time is going to be split.
judges: Gould, Berzon, Block